**W. B. D. COOPER, Appellant,**

v.

**The STATE of Texas, Appellee.**

No. 42002.

Court of Criminal Appeals of Texas.

Oct. 22, 1969.

Rehearing Denied Dec. 3, 1969.

Legg, Saxe & Baskin, by Pat M. Baskin, Midland, Lucius D. Buntin, Odessa, for appellant.

James A. Mashburn, Dist. Atty., Midland, and Jim D. Vollers, State's Atty., Austin, for the State.

OPINION

BELCHER, Judge.

This is an appeal from an order revoking probation.

Upon his plea of guilty before the court on January 6, 1967, the appellant was found guilty of the felony offense of driving while intoxicated and his punishment was assessed at a term of five years. Probation was granted.

Among the conditions of his probation was that he commit no offense against the laws of this State.

On July 22, 1968, the attorney for the state in Midland County filed an amended motion to revoke probation alleging:

"That on or about the 6th day of June, A.D., 1968, in the County of Midland and State of Texas, W. B. D. Cooper (appellant) did unlawfully, willfully, and designedly attempt to produce an abortion on one _____ [1] then and there a pregnant woman, by then and there thrusting and forcing into the womb and private parts of the said _____, with her consent, a certain instrument calculated to produce an abortion upon her, the said _____, against the peace and dignity of the State."

After a hearing on the state's motion to revoke, the court entered an order revoking the probation upon a finding that the evidence adduced sustained the allegations of the state's motion.

For reversal, the appellant urges the following grounds:

"The court erred in revoking appellant's probation for the reason that the elements of the offense of attempted

1. Blank spaces indicate names appearing in the record which are omitted.

abortion were not established by the evidence presented in appellant's revocation hearing."

"The court erred in revoking appellant's probation for the reason that there is no evidence that the events presented at the revocation hearing occurred after the appellant was placed on probation."

On the hearing of the motion, the following evidence was adduced:

The complainant, a female, age 21, with a male companion, age 25, arrived in Midland from Amarillo by automobile about 8 a. m., on June 6, and she first saw the appellant, Dr. Cooper, with whom she had an appointment that day about 9:30 a. m., in his office in Midland.

The complainant testified in part as follows:

"Q  Did you talk with Dr. Cooper at that time (9:30 a. m.)?

"A  Yes.

"Q  What was the nature of your conversation with him, please, mam?

"A  He asked me how far along I was, and that was it.

"Q  Did you answer his questions?

"A  Yes.

"Q  What did you tell him?

"A  I told him that I was 12 weeks and four days.

"Q  What happened then?

"A  Well, the financial part of the transaction was discussed between him and Mr.

———————.

"Q  Were you present at that time?

"A  Yes.

*     *     *     *     *     *

"Q  What happened after the financial arrangements were made, please?

"A  I was taken into an examining room.

"Q  Was that there at Dr. Cooper's office?

"A  Yes.

"Q  All right, and what happened there?

"A  His nurse prepared me for whatever was to happen, and she had an assistant with her.  And then Dr. Cooper came in and gave me a shot for some reason to knock me out.

"Q  Do you remember whether the assistant was male or female?

"A  Male.

"Q  And when you said they prepared you, what do you mean by that?

"A  Well, of course, they took all my clothes off, as well as I can remember. They took my skirt off—I had on a skirt and blouse, and put a paper sheet over me, of course, and put my feet up to elevate them.

"Q  And then Dr. Cooper was not present at this point?

"A  No.

"Q  All right, when did you next see Dr. Cooper?

"A  When he came in to inject the shot.

"Q  Did you have any conversation at that time?

"A  He said something, but I can't remember what he said.

"Q  And Dr. Cooper gave you the shot himself?

"A  Yes.

"Q  What happened then?

"A  I went to sleep.

"Q  When did you wake up?

"A  It was approximately about 11 o'clock.

*     *     *     *     *     *

"Q What was your condition at that time? Was anything changed from the time that you had been given the shot, did you notice any difference?

"A Well, yes, bleeding had started and I was just—well I didn't notice anything except my stomach and all felt extremely full.

*  *  *  *  *  *

"Q All right, and then where did you go?

"A To Dr. Cooper's home.

*  *  *  *  *  *

"Q Who took you there?

"A His nurse.

*  *  *  *  *  *

"Q During this period of time, up to that point of time, had you been given any type of medication?

"A When I got up at seven she gave me a pill, a little white pill.

"Q Had there been any dressing or any medication in that regard?

"A No.

*  *  *  *  *  *

"Q And when did you next see Dr. Cooper?

"A * * * I saw Dr. Cooper the next morning.

"Q And where was that? was that still in his home?

"A Yes.

"Q And about what time was that, do you recall?

"A Approximately eight o'clock.

"Q And what transpired at that time?

"A Well, I was informed that I was being taken home, and first of all I would need to go to Dr. Cooper's office for him to remove packing from me, and we left, his nurse, and some other man was there, and

Dr. Cooper, and we went to his office where he removed the packing.

"Q Did Dr. Cooper himself do that?

"A Yes.

*  *  *  *  *  *

"Q What happened after the packing was removed?

"A I was given a shot in case infection started.

"Q And then what?

"A And then we went back over to Dr. Cooper's home, and then proceeded to go home.

"Q Did you have any conversation with Dr. Cooper at that time?

"A Yes.

"Q What was the nature of that conversation?

"A Well, he told me at that time that I would need to see a doctor after I passed the fetus. There would be no need until then. And also that I wouldn't tell anyone what had happened.

*  *  *  *  *  *

"Q And what happened after you got to Amarillo?

"A Well, I went by and saw my sister-in-law, and then I went home, and then about 7 o'clock my brother called and said they had all decided that it would be time —that I should go to the doctor, go to the hospital. So I called my family physician and he recommended Dr. Patterson, and I called him and made an appointment with him.

"Q And were you having any physical problems at this time?

"A Well I was hurting a lot.

"Q Where did you go after you had made the appointment with Dr. Patterson?

"A I went to the hospital.

*  *  *  *  *  *

"Q And what happened there at the hospital?

"A Well, I went to the emergency room, and checked in and Dr. Patterson came in, and examined me and removed something, I don't even know what, and told me I was going to have to be put in the hospital.

"Q How long did you remain in the hospital?

"A Two and a half days.

"Q Before you went to the hospital in Amarillo, had you passed the fetus?

"A No.

\* \* \* \* \* \*

"Q Were you given any medication to take by Dr. Cooper to take with you?

"A No; I was given several pills before I left.

"Q Did you take those?

"A I took all but the last one.

"Q Did you know the purpose of them?

"A I was told they were for induced labor."

The male companion of the complainant testified in part as follows:

"Q Are you acquainted with the defendant in this action, Dr. W. B. D. Cooper?

"A Yes.

"Q When did you first become acquainted with him?

"A In a telephone conversation, sir, on June 5.

"Q And did you talk with Dr. Cooper yourself?

"A Yes, sir.

"Q And what was the nature of that conversation, please, sir?

"A I told him that myself and a girl friend of mine were in trouble, and he then asked me how far along she was, and I told him. And we discussed the time, place, and financial arrangements.

"Q Now when you say 'time, place and financial arrangements', specifically what did you discuss, please?

"A Well, we decided—the agreement we decided on, sir, was the following morning approximately 8 o'clock or 8:30 at his office, and the agreement over the phone was $400 cash, an automobile, and perhaps a check for the balance; \* \* \*.

\* \* \* \* \* \*

"Q Did Dr. Cooper then come in and discuss this matter with you?

"A Yes, sir.

"Q What happened when Dr. Cooper arrived?

"A He came in and we exchanged good morning, and he—I think his first question to Miss ——————— was how far along she was, and then did I have the payment, I can't remember the word that was used, money, payment, whatever, and I said yes. \* \* \*

\* \* \* \* \* \*

"Q Now besides the financial arrangements, do you recall any other conversation with Dr. Cooper at the time?

"A I have no clear recollection of—I think Miss ——————— and myself both asked him how long it would take or something about the operation of it, which we could understand, I mean how long it would take, what would happen, a sort of tentative time schedule.

"Q And what was the time schedule given you, if you recall?

"A I can't remember what day June 5th was on, but I think the agreement was that everything should be completed by the following Saturday, which was a space of three, four or five days, something like that.

"Q What happened after your conversation with Dr. Cooper and the financial arrangements?

"A Well, Miss _____ and—Miss _____ went into another room, and I think shortly thereafter Dr. Cooper went into the room. I can't remember whether he went with her—I don't think he did, I think he asked his nurse to show her into another room.

\* \* \* \* \* \*

"Q And when did you next see Miss _____?

"A About—this is very vague, about two hours after we had first talked to Dr. Cooper.

"Q Where did you see her?

"A She was reclining in a bed, and under sedation of some sort.

\* \* \* \* \* \*

"Q Where did you go after you arrived here? (On return from Amarillo)

"A I went to Dr. Cooper's home.

"Q What happened there?

"A I knocked on the door, and another gentleman answered, and I told the gentleman that I would like to see Dr. Cooper, which I saw him and talked to him, and told him I had come to take Miss _____.

"Q What happened then?

"A He said, 'Fine.' He said, 'I'll have to take her down to my office, and \* \* \*' and I forget what he said he had to do, but he said he had to take her to his office first, before I would take her with me. I don't know really what he said he had to do, I couldn't say.

"Q And did he take her to his office?

"A Yes.

"Q What happened then?

"A The friends who rode down with me and myself waited in Dr. Cooper's home until he and Miss _____ and his—I don't remember how many were with them, but they came back, bringing Miss _____, and then we left for Amarillo."

An Amarillo physician testified that:

"A I was contacted by telephone by _____ about 8:30, or possibly a little earlier on the night of the 7th of June, by telephone. She stated her complaint, stated that Dr. Ralph Carroll of Amarillo, Texas, had been her physician and he had referred her to me, stated that she had been bleeding and cramping since early morning, the morning of the 7th of June, that her symptoms had become progressively worse, and could I see her in the emergency room at _____ Hospital, or rather could I see her in the emergency room, and I directed her to _____ Hospital emergency room at that time.

"Q Did you see there at the hospital?

"A I saw her subsequently in the emergency room at _____ Hospital approximately at nine o'clock (p. m.).

\* \* \* \* \* \*

"Q Dr. _____, this that you are referring to, did you write that yourself?

"A This is in my handwriting.

"Q Once again, you may refer to any notes you want—

"A If it's proper, I'll refer to my office notes that I—copy of which in toto or in essence are the same as are contained in the hospital records.

"Q All right.

"A Miss _____ stated that she was a 21 year old white female who had her 21st birthday, as I remember, in May of 1968. She stated that her last normal menstrual period had been approximately, as I calculated, 15 weeks prior to the time that I had seen her. She had all the subjective signs and symptoms of pregnancy, including nausea, vomiting, breast tenderness, urinary frequency, which led us to

suspect that she was pregnant. At this point she stated that she had been bleeding and cramping as she told me previously over the telephone, since early morning hours of the 7th. At this point in time the most likely diagnosis was that of a threatened miscarriage, threatened abortion. She was examined at this point.

\*　　\*　　\*　　\*　　\*　　\*

"Q　Now continuing with your examination of her, you were able to determine that she had been pregnant, is that right, that she was pregnant?

"A　Miss _____ was pregnant at the time I examined her initially. The mouth of her womb, more importantly was dialated to approximately a centimeter or a centimeter and a half; under normal circumstances the mouth of the womb would be dialated to approximately two tenths of a centimeter. Hanging or extruding from the mouth of the womb was a non-pulsatile cord-like structure, which I suspected was a fetal umbilical cord. This was surgically removed with scissors and sent to the laboratory for pathological examination, and was consequently proven to be a fetal umbilical cord.

\*　　\*　　\*　　\*　　\*　　\*

"Q　Specifically what did you observe in relation to any trauma?

"A　Well, under normal circumstances the mouth of the womb tends to be covered with a smooth homogeneous layer of tissue that will be dark bluish or reddish, but has its integrity intact. The tissues at the mouth of Miss _____ womb were a bright red color, and the architecture of the smoothness of the surface had been disrupted by some means.

"Q　What other disruption did you observe physically in Miss _____?

"A　I thought that there was possibly evidence of tenaculum marks in the anterior lip of the cervix. I couldn't be absolutely positive of this, because they heal very rapidly after the tenaculum is withdrawn. A tenaculum is a sharp two-toothed or four-toothed instrument used to grasp tissues and hold them firm.

"Q　Pertaining to the womb and your observations of Miss _____, what did you observe or find in regard to this?

"A　I have already stated that, that it was enlarged to approximately a size compatible with a 14 to 16 weeks gestation.

\*　　\*　　\*　　\*　　\*　　\*

"Q　Were the physical findings that you found consistent with an attempted abortion of Miss _____?

"A　Yes, when I found the umbical structure extruding through the mouth of the cervix, \* \* \*.

\*　　\*　　\*　　\*　　\*　　\*

"Q　Once again, Doctor, did your physical findings comport with the fact that Miss _____ had received instrumentation into her womb in an attempt to abort her pregnancy?

\*　　\*　　\*　　\*　　\*　　\*

"A　In my opinion manipulation of the mouth of the womb of Miss _____ had been effected by some means in an attempt to cause her to abort."

While testifying the attending physician of the complainant at the hospital in Amarillo, identified the hospital records of the complainant made either by him or at his direction, and they reflect that she arrived at the hospital at 8:30 p. m., June 7, 1968, and was admitted at 9:40 p. m., that day, and was discharged on June 10, 1968.

The appellant did not testify or call any witnesses in his behalf.

█　The hearing upon whether probation should be revoked is not a criminal trial. Tate v. State, Tex.Cr.App., 365 S.W. 2d 789.

█　The sole issue on appeal from the revocation of probation is whether the judge abused his discretion in revoking probation that had been granted. Torres v. State, Tex.Cr.App., 403 S.W.2d 135;

McKnight v. State, Tex.Cr.App., 409 S.W. 2d 858; Manning v. State, Tex.Cr.App., 412 S.W.2d 656; and other cases listed under Art. 42.12, Note 38, V.A.C.C.P.

From a consideration of all the facts and circumstances as shown by the evidence introduced on the hearing, it is concluded that the evidence is sufficient to sustain a finding by the trial court that appellant committed the offense of attempted abortion on the female named in the application to revoke probation and did not abuse his discretion in finding that the violation occurred during the period of probation.

The judgment is affirmed.